**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TOUSA, INC.,

Appellant,

vs.

CITICORP NORTH AMERICA, INC.,

Appellee.

Case No. 09-cv-60589 (Jordan)

# BRIEF FOR APPELLEE CITICORP NORTH AMERICA, INC.

SMITH HULSEY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida  32202

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York  10112

*Attorneys for Appellee*

# TABLE OF CONTENTS

Page

Issues Presented ...................................................................................................1

Standard of Review................................................................................................1

Statement of the Case.............................................................................................1

    A.  The Parties........................................................................................1

    B.  Appellant's Initial Complaint ........................................................2

    C.  Appellant's Amended Complaint ...................................................4

    D.  Appellant's Second Amended Complaint.......................................5

Statement of Facts..................................................................................................6

ARGUMENT ..........................................................................................................8

I.    THE REPAYMENT OBLIGATIONS ARE NOT AVOIDABLE AS THEY WERE INCURRED BEFORE THE ALLEGED INSOLVENCY DATE .........................................10

    A.  Neither Section 548 Nor Any Case Law Applying Section 548 Endorses Appellant's Position.........................................................11

    B.  Congress Never Endorsed Appellant's Position...........................14

    C.  Even if Rubin Were Not Bad Law, It Is Entirely Distinguishable.............................16

    D.  The Bankruptcy Court Gave Appropriate Consideration to Public Policy Concerns...............................................................18

    E.  Appellant's Alternative Argument that Amending a Loan Agreement Resets Obligations Already Incurred Finds No Support in the Law or the Loan Agreements Themselves .....................20

II.  THE LIEN TRANSFERS ARE NOT AVOIDABLE AS THEY WERE MADE BEFORE THE ALLEGED INSOLVENCY DATE.....................................21

CONCLUSION.....................................................................................................25

Certificate of Compliance with Local Rule 2090-1(A) ........................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

<u>Ames Dep't Stores, Inc</u>. v. <u>Wertheim Schroder & Co., Inc</u>. (<u>In re Ames Dep't Stores, Inc.</u>),
    161 B.R. 887 (Bankr. S.D.N.Y. 1993) ...................................................................9 n.5

<u>B.Z. Corp</u>. v. <u>Continental Bank, N.A</u>. (<u>In re B.Z. Corp</u>.),
    34 B.R. 546 (Bankr. E.D. Pa. 1983) ...........................................................................21

<u>Bauman</u> v. <u>Bliese</u> (<u>In re McCarn's Allstate Fin., Inc</u>.),
    326 B.R. 843 (Bankr. M.D. Fla. 2005) ................................................................12, 13

<u>Cohen</u> v. <u>Morgan Schiff & Co</u>. (<u>In re Friedman's Inc</u>.),
    385 B.R. 381 (S.D. Ga. 2008) .....................................................................................18

<u>Feltman</u> v. <u>Warmus</u> (<u>In re American Way Serv. Corp</u>.),
    229 B.R. 496 (Bankr. S.D. Fla. 1999) .........................................................................13

<u>Fin. Sec. Assur., Inc</u>. v. <u>Stephens, Inc</u>.,
    450 F.3d 1257 (11th Cir. 2006) ...............................................................................3 n.3

<u>Goldberg</u> v. <u>Countrywide Home Loans, Inc</u>. (<u>In re Seaway Int'l Trans., Inc</u>.),
    341 B.R. 333 (Bankr. S.D. Fla. 2006) ...................................................................12, 13

<u>Kapila</u> v. <u>WLN Family Ltd. P'ship</u> (<u>In re LeNeve</u>),
    341 B.R. 53 (Bankr. S.D. Fla. 2006) .....................................................................12, 13

<u>La Grasta</u> v. <u>First Union Sec., Inc</u>.,
    358 F.3d 840 (11th Cir. 2004) .................................................................................3 n.3

<u>Levit</u> v. <u>Spatz</u> (<u>In re Spatz</u>),
    222 B.R. 157 (N.D. Ill. 1998) ......................................................................................13

<u>Lorillard</u> v. <u>Pons</u>,
    434 U.S. 575 (1978)...............................................................................................15, 16

<u>Menchise</u> v. <u>Clark</u> (<u>In re Dealers Agency Servs</u>.),
    380 B.R. 608 (Bankr. M.D. Fla. 2007) .......................................................................12

<u>NLRB</u> v. <u>Bildisco & Bildisco</u>,
    465 U.S. 513 (1984)......................................................................................................15

<u>Official Comm. of Unsecured Creditors of Toy King Distribs</u>. v. <u>Liberty Sav. Bank, FSB</u> (<u>In re Toy King Distribs</u>.),
    256 B.R. 1 (Bankr. M.D. Fla. 2000) ...........................................................................13

Perkins v. Crown Fin., LLC (In re Int'l Mgmt. Assocs. LLC),
  No. 06-6421, 2007 Bankr. LEXIS 1566 (Bankr. N.D. Ga. Mar. 6, 2007)...................18

Rubin v. Manufacturers Hanover Trust Co.,
  661 F.2d 979 (2d Cir. 1981).................................................................................. passim

Sublett v. Equitable Life Assurance Soc'y (In re Sublett),
  895 F.2d 1381 (11th Cir. 1990) ...................................................................................15

United States v. Fretz (In re Fretz),
  244 F.3d 1323 (11th Cir. 2001) ....................................................................................1

Venezia Amos LLC v. Favret,
  No. 07-0146, 2008 WL 410163 (N.D. Fla. Feb. 12, 2008).....................................3 n.3

Woodard v. Stewart (In re Stewart),
  280 B.R. 268 (Bankr. M.D. Fla. 2001) ................................................................ 12-13

## STATUTES AND RULES

11 U.S.C. § 67 (repealed)................................................................................................15

11 U.S.C. § 548................................................................................................... passim

FED. R. CIV. P. 54 .............................................................................................................6

Fla. Stat. § 726 ..................................................................................................... 11, 12-13

## ARTICLES AND TREATISES

COLLIER LENDING INSTS. & THE BANKR. CODE (2007)................................................ 11-12

Frank R. Kennedy, Reception of the Uniform Fraudulent Transfer Act,
  43 S.C. L. REV. 655 (1992) .........................................................................................19

Kenneth C. Kettering, The Pennsylvania Uniform Fraudulent Transfer Act,
  65 PA. BAR ASS'N Q'TLY 68 (1994) .............................................................................19

Steven L. Schwarcz, The Impact of Fraudulent Conveyance Law on Future
Advances Supported by Upstream Guaranties and Security Interests,
  9 CARDOZO L. REV. 729 (1987) ...................................................................... 17, 19-20

## ISSUES PRESENTED

1.      Was the Bankruptcy Court correct in holding that, under Section 548 of the Bankruptcy Code, the obligations of the TOUSA Subsidiaries to repay the Revolver debt were incurred before July 31, 2007, given that the TOUSA Subsidiaries (i) became guarantors of the Revolver debt in March 2006, (ii) became joint-and-several co-borrowers of the Revolver debt in January 2007, and (iii) pledged their assets as collateral to secure the Revolver debt in October 2006?

2.      Was the Bankruptcy Court correct in holding that, under Section 548 of the Bankruptcy Code, liens perfected before July 31, 2007 are deemed to have been transferred before July 31, 2007, notwithstanding that the instruments of perfection were updated thereafter to reflect an additional secured party?

## STANDARD OF REVIEW

On an appeal from a Bankruptcy Court order, "conclusions of law . . . are reviewed de novo."  United States v. Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001).

## STATEMENT OF THE CASE

**A.      The Parties**

Debtor TOUSA, Inc. was the parent company of a homebuilding enterprise with operations in Florida, Texas, the Mid-Atlantic states and the West.  R19 ¶ 8.[1]  On January 29, 2008, TOUSA, Inc., its principal homebuilding subsidiary TOUSA Homes

---

[1]      Citations to "R__" refer to the attachments to Entry #2 on this Court's Docket, No. 09-60589, representing the Record on Appeal transmitted by Appellant on April 21, 2009.  Emphasis in quotations has been added throughout this brief.

LP, and numerous other subsidiaries (the "TOUSA Subsidiaries," or, together with TOUSA, Inc. and TOUSA Homes LP, "TOUSA") filed for Chapter 11 bankruptcy protection.

Appellee Citicorp North America, Inc. was the Administrative Agent of a $800 million revolving credit line (later reduced to $700 million) (the "Revolver") created in March 2006 for TOUSA's benefit and amended several times thereafter.  R22.

Appellant, the Official Committee of Unsecured Creditors of TOUSA, Inc., is the plaintiff in this adversary proceeding, which seeks to avoid as fraudulent conveyances the TOUSA Subsidiaries' obligations to repay the Revolver debt and the liens they pledged to secure that debt.  The claims against Appellee and the Revolver lenders,[2] as set forth in Appellant's initial complaint dated July 15, 2008 and its amended complaint dated October 17, 2008, were dismissed by the Bankruptcy Court.  The instant appeal comes from the Order entering a final judgment dismissing the amended complaint.  R34.

**B.      Appellant's Initial Complaint**

Appellant's initial complaint alleged that TOUSA was rendered insolvent by a series of transactions that occurred on July 31, 2007, which included an amendment to the Revolver that reduced the credit available thereunder from $800 million to $700 million and permitted TOUSA to take additional loans.  R2 ¶ 1; R26 p. 1. That initial complaint asserted fraudulent conveyance claims against Appellee under the

---

[2]    In the initial complaint, Citicorp, as Administrative Agent for the Revolver, was named as defendant and the other lenders who participated in that financing were named as Doe defendants.  R2 ¶ 12.  The amended complaint attempted to name each lender.  R19 ¶ 12(iii).

Bankruptcy Code, Florida law, and New York law.  R2 ¶¶ 45-83.  The complaint characterized the July 31, 2007 Revolver amendment as a "New Loan" (R2 ¶ 31(iii)), despite the fact that the Revolver long predated July 31, 2007 and, indeed, was titled, in big, bold, capital letters: "*SECOND AMENDED* AND RESTATED REVOLVING CREDIT AGREEMENT."  R26.

　　　　Appellee moved to dismiss that complaint on the ground that the Revolver obligations and the liens securing them predated the alleged insolvency date of July 31, 2007, as demonstrated by the undisputed documentary evidence.[3]  R3.  Specifically, the TOUSA Subsidiaries had pledged liens to secure the Revolver debt when the Revolver was amended to become a secured facility in October 2006 (R8 p. 1), and the TOUSA Subsidiaries incurred repayment obligations when they signed on as guarantors of the Revolver in March 2006 (R7) and when they became co-borrowers in January 2007 (R9 p. 1, § 10.20 pp. 108-11).  R3 pp. 14-17.

　　　　In opposing the motion to dismiss below, Appellant abandoned the theory of its initial complaint that the Revolver was "entered into" on July 31, 2007, as the complaint had alleged.  R1 ¶ 31.  Instead, Appellant argued that it was irrelevant that the Revolver obligations were incurred and the lien transfers made before July 31, 2007 because "transfers and conveyances occurred every time that money was borrowed

---

[3]　The Bankruptcy Court properly considered the terms of the various loan agreements as documents referenced in the complaint and/or central to the plaintiff's case.  See R3 p. 5 n.4 (citing, e.g., La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004); Fin. Sec. Assur., Inc. v. Stephens, Inc., 450 F.3d 1257, 1264 (11th Cir. 2006); Venezia Amos LLC v. Favret, No. 07-0146, 2008 WL 410163, *8 n.29 (N.D. Fla. Feb. 12, 2008)).

pursuant to the Amended Revolver Agreement." R16 p. 5.  In other words, Appellant

was arguing that every draw on the Revolver -- and not the dates of the credit agreement,

guarantees, or lien perfection -- was a new conveyance.  That is also Appellant's primary

theory in its briefing to this Court.

Ruling on the motion to dismiss on September 17, 2008, the Bankruptcy Court

rejected "the notion that the transfer occurs at a time after the granting of the lien," R38

p. 96, undermining Appellant's argument that conveyances occurred whenever the

debtors drew on the Revolver.  The Court accordingly dismissed Appellant's complaint,

while granting it leave to replead so it could "clarif[y] for all of us[] exactly what

transfers it finds create liability on the part of the [R]evolver."  R38 p. 96.

**C.    Appellant's Amended Complaint**

In its amended complaint, R19, Appellant returned to the position it took in its

original complaint -- that the debtors incurred entirely new obligations whenever the

Revolver was amended.  Appellant's theory was that the amendments somehow had

erased the debtors' pre-existing obligations and liens and imposed entirely new ones.

R19 ¶¶ 34, 41, 42.  On appeal, Appellant presents that theory to this Court as an

"alternative[]" argument.  Appellant's Br. p. 15.  The Bankruptcy Court rejected this

argument, holding:

> I do not accept the proposition that in respect of existing collateral,
> which came into effect prior to June or, rather, July 2007, that a new lien
> was created by virtue of the entry of the parties into a new lending
> agreement. . . .   The preexisting liens, which were granted in the October
> 2006 revolver, as amended in January 2007, carried forward, and to the
> extent that the collateral that was granted under those prior agreements
> carried forward under the July amendments, I find that there was no new
> transfer that's subject to avoidance as a fraudulent transfer under Section
> 548. . . .   Because the revolver liens here were perfected no later than

> January of 2007, I don't think that the subsequent modifications . . .
> affect the liens previously granted.

R33 pp. 143-44, 145.  The amended complaint also dropped the Florida law claims against the Revolver conveyances, but continued to assert fraudulent transfer claims under the Bankruptcy Code and New York law.  R19 ¶¶ 46, 52, 57-63.

In dismissing the amended complaint, the Court again granted Appellant leave to amend to plead "new categories of collateral" pledged on or after July 31, 2007.  R33 p. 142-43.

**D.      Appellant's Second Amended Complaint**

Thereafter, Appellant filed a second amended complaint.  No. 08-1435 (Bankr. S.D. Fla.) D.E. #226.  In its second amended complaint, Appellant purported to address "new categories of collateral" pledged after July 31, 2007 by alleging (i) that "the [TOUSA] Subsidiaries granted more than 2,500 mortgages between July 31, 2007 and the petition date to Citicorp as agent under the First Lien Term Loan and Amended Revolver Agreement" (id. ¶ 43) and (ii) that "[t]he parties to the Amended Revolver Agreement filed new or amended UCC financing statements on August 1 and 2, 2007."  Id. ¶ 41.

But Appellant apparently had second thoughts.  Accordingly, in January 2009, it informed the Bankruptcy Court that it was abandoning all of the Revolver-related claims in its second amended complaint except to pursue the instant appeal.  See No. 08-10928 (Bankr. S.D. Fla.) D.E. #2492.  On February 4, 2009, Appellant filed a third amended complaint (No. 08-1435 (Bankr. S.D. Fla.) D.E. #243) in which it dropped all claims related to the Revolver (but continued asserting claims arising from other facilities) and dropped the Revolver lenders as named defendants.  At Appellant's

request, the Court entered a judgment of dismissal of the first amended complaint pursuant to FED. R. CIV. P. 54(b), R34, from which the instant appeal was taken.

## STATEMENT OF FACTS

The most misleading spin Appellant puts on the history of the Revolver in this appeal is its assertion, contradicted by the express terms of each Revolver amendment, that each amendment created an entirely new credit facility, "supersed[ing]" the facility already in place. Appellant's Br. pp. 4, 8. Only by this mischaracterization can Appellant begin to find any support for its claim that lien transfers made, and obligations incurred, long before the alleged insolvency date are avoidable as fraudulent conveyances.

The Revolver was created on March 9, 2006, when a consortium of lenders, with Appellee as the Administrative Agent, extended an $800 million revolving credit line to TOUSA, Inc. R22. The Revolver provided that it was to be used "for working capital from time to time and for other general corporate purposes" as well as to "repay amounts due and owing" under a prior credit facility. R22 § 4.12 p. 48. TOUSA was entitled to make draws against the Revolver credit line as it needed funds and was permitted to pay down the Revolver debt as it had excess funds, all, of course, confined by the Revolver's overall credit limit. R22 §§ 2.1, 2.2, 2.6. While at that time TOUSA, Inc. was the sole borrower on the Revolver, the TOUSA Subsidiaries executed guaranties of their parent company's repayment obligations, making them jointly and severally liable for the Revolver debt. See R7 § 1 p.1.

The Revolver was amended on October 23, 2006. That amendment provided that its purpose was to "amend the March 2006 Credit Agreement in certain respects." R24 p. 1. In exchange for the waiver of a condition that was preventing further draws,

the Revolver became a secured credit facility, with TOUSA, Inc., TOUSA Homes LP, and the TOUSA Subsidiaries pledging substantially all of their assets as security.  R24 pp. 1, 3, 6-8.  Confirming that the amendment was intended to preserve the pre-existing credit facility and not create a new one, it provided:

> The March 2006 Credit Agreement and this Amendment shall be read, taken and construed as one and the same instrument from and after the Amendment Effective Date. . . .  **The March 2006 Credit Agreement and the other Loan Documents**, as modified by this Amendment, are and shall **continue** to be in **full force and effect** and are hereby **ratified** and **confirmed in all respects**.

R24 §§ 4.04, 4.05.

By another amendment in January 2007, the TOUSA Subsidiaries obtained the right to draw on the Revolver directly as co-borrowers, and were made jointly and severally liable for repayment of the Revolver debt in that capacity.  R25 § 10.20.

On July 31, 2007, the Revolver was amended again.  Like the previous amendments, the July 2007 amendment specified that it was intended to preserve, not supersede, the debtors' pre-existing obligations.  The July 2007 amendment agreement provided:

> [A]ll Loans, Letters of Credit or other extensions of credit outstanding under the First Amended and Restated Credit Agreement . . . **shall continue** as Loans, Letters of Credit or other extensions of credit, as applicable, under the Second Amended and Restated Revolving Credit Agreement.
>
> * * *
>
> [A]ll amounts owing by the Borrowers under the First Amended and Restated Credit Agreement to any Person in respect of accrued and unpaid interest and fees on the Loans, Commitments and Letters of Credit (each as defined in the First Amended and Restated Credit Agreement) **shall continue** to be due and owing on such Loans, Commitments and Letters of Credit under the Second Amended and Restated Revolving Credit Agreement.

* * *

> ***The rights and obligations of the parties to the First Amended and Restated Credit Agreement*** with respect to the period prior to the Amendment Effective Date ***shall not be affected*** by such amendments and restatement.

R27 pp. 1-2.  The primary purpose of the July 2007 amendment was to waive restrictions contained in the Revolver credit agreement against TOUSA's taking on additional debt (e.g., R25 § 7.1), so as to permit TOUSA to enter into two secured term loans totaling $500 million.  R26 p. 1.  The amendment also lowered the maximum credit available under the Revolver from $800 million to $700 million.  Id.

As Appellant was the Administrative Agent of the new term loans,[4] following the July 31 closing it re-filed mortgages and U.C.C. financing statements on the collateral that had previously been pledged (and perfected) to it as the Revolver Agent to reflect the fact that it was now also holding the liens on behalf of the term loan lenders as well. Notwithstanding that these liens were previously perfected in favor of Appellee as Administrative Agent for the Revolver in connection with the October 2006 amendment, Appellant asserts that the re-perfection of those liens to secure the term loans renders the Revolver liens avoidable.

## ARGUMENT

Section 548 of the Bankruptcy Code provides for the avoidance of "transfer[s] . . . of an interest of the debtor in property" and "obligation[s] . . . incurred"

---

[4]  Appellant remains the Administrative Agent of one of the term loans, which shares first-priority lien status with the Revolver.  Another bank has replaced Appellant as Administrative Agent of the second-priority lien term loan.

by the debtor when the debtor was insolvent and for which the debtor did not receive reasonably equivalent value.  11 U.S.C. § 548(a)(1), (a)(1)(B).[5]  Here, the transfers challenged are the TOUSA Subsidiaries' conveyances to Appellee of liens on their assets to secure the Revolver, and the obligations challenged are the Subsidiaries' obligations to repay the Revolver.  The complaint and amended complaint both alleged that the insolvency date in this case is July 31, 2007.  R2 ¶¶ 1, 5; R19 ¶¶ 1, 5.  Consequently, no liens transferred before July 31, 2007, or obligations incurred before July 31, 2007, could be avoidable.  Given that the TOUSA Subsidiaries' Revolver repayment obligations were incurred before July 31, 2007, and that the Subsidiaries' lien transfers were made and perfected before July 31, 2007, the issues in this appeal should be straightforward.

Appellant attempts to muddy the waters by urging this Court to adopt a new standard for determining when an obligation is incurred and a transfer made, and incorrectly claims this approach is dictated by the statutory language of Section 548.  It plainly is not.  With respect to lien transfers, the Bankruptcy Code is very specific on the question of when the transfers are deemed made:

> For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee.

_____

[5]  New York law is substantially the same.  See Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc. (In re Ames Dep't Stores, Inc.), 161 B.R. 887, 889 n. 1 (Bankr. S.D.N.Y. 1993) ("[t]his Court need not discuss the components of a fraudulent conveyance claim under New York state law, the elements are almost identical to that of 11 U.S.C. § 548(a)(2)").

11 U.S.C. § 548(d)(1).  While no analogous provision specifies when an obligation is incurred, the Bankruptcy Court held here that obligations secured by liens are incurred when the liens are transferred.  R38 pp. 96-98.  A holding that such obligations are incurred when the debtor actually makes the commitment to become liable for repayment, which here was before the liens were perfected, leads to the same result. Neither the plain language of the Bankruptcy Code, nor the lone, discredited Second Circuit precedent relied on by the Appellant, supports a different result.

## I.

### THE REPAYMENT OBLIGATIONS ARE NOT AVOIDABLE AS THEY WERE INCURRED BEFORE THE ALLEGED INSOLVENCY DATE

As described above, the Bankruptcy Court rejected the notion that an obligation secured by a lien is incurred "at a time after the granting of the lien."  R38 pp. 96, 98.  Appellant's asserted basis for reversal is that a new obligation to repay debt under a revolving credit line arises every time the debtor draws on the credit line, rather than when the debtor contractually undertakes the obligation to repay all future credit draws. Appellant's Br. p. 9.  For this argument, Appellant relies exclusively on the case of Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981).  In Rubin, the Second Circuit held that guarantors "'incurred' an 'obligation' of repayment . . . whenever [the borrowers] borrowed under the loan line."  Id. at 990.  That case, decided under the Bankruptcy Act, is not an accurate statement of law under the Bankruptcy Code, and it is telling that Appellant fails to cite a single other case that follows this holding or reaches the same result.

Appellant makes three arguments for following Rubin, none of which holds water: first, that the result of Rubin is dictated by "the plain text of the statute and the

case law interpreting it" (Appellant's Br. p. 12); second, that "Congress has endorsed <u>Rubin</u>'s holding" (Appellant's Br. p. 13); and, finally, that <u>Rubin</u> should have heightened persuasive value solely because it originated from the Second Circuit, "the Circuit that governs the nation's financial hub."  Appellant's Br. p. 13.  Each of these statements is without basis and mischaracterizes the law.

**A.      Neither Section 548 Nor Any Case Law Applying
          <u>Section 548 Endorses Appellant's Position</u>**

As noted above, the "plain text" of Section 548 says nothing about when an "obligation" is incurred, in marked contrast to its explicit specification about when a lien "transfer" to secure that obligation is made.  <u>See</u> 11 U.S.C. § 548(d)(1).  It is this silence in the statute, not its "plain text," that gives Appellant the flexibility to argue that an obligation is incurred on any number of dates other than the date on which the debtor actually executes the agreement undertaking the obligation.

As Appellant recognizes, the practical consequences of the <u>Rubin</u> decision proved so unsettling across the United States that forty-four states responded to it by clarifying any uncertainty in their own fraudulent transfer laws.  The Uniform Fraudulent Transfer Act ("UFTA") adopted by these states after <u>Rubin</u> expressly provides that "an obligation is incurred . . . when the writing executed by the obligor is delivered to or for the benefit of the obligee."  UFTA § 6.5; <u>accord</u>, <u>e.g.</u>, Fla. Stat. § 726.107(5)(b) (same).  An Official Comment to that provision notes that its purpose is "to resolve uncertainty arising from <u>Rubin</u>."  UFTA § 6 cmt. 3.  Collier further explains:

> [T]he relevant time for testing the [obligation] is at the outset of the transaction when the writings are delivered.  This will assure that . . . a separate fraudulent conveyance analysis will not be made each time an advance is made . . . -- which could be over a period of months or years -- but only at the time the [agreement] is signed. . . .  This

> provision regarding the time for testing the transfer in connection with a guaranty rejects the approach in <u>Rubin</u> v. <u>Manufacturers Hanover Trust Co</u>.

1-3 COLLIER LENDING INSTS. & THE BANKR. CODE ¶ 3.06 (2007).  Applied to the facts of this case, this principle clearly dictates that the TOUSA Subsidiaries incurred the obligation to repay the Revolver debt when they first executed guaranties in March 2006 taking on that obligation (R7), or at the latest when they became joint and several co-borrowers on the Revolver in January 2007 (R9).

Importantly, there is no support for Appellant's position that the Florida fraudulent-transfer statute specification as to when an obligation is incurred is contrary to, rather than fully consistent with, the standard for when an obligation is incurred under Section 548.  Indeed, the opposite is true.  "The state fraudulent transfer provisions are *essentially identical* to those found in the bankruptcy code, with the exception that there is a longer statute of limitations under state law."  <u>Kapila</u> v. <u>WLN Family Ltd. P'ship</u> (<u>In re LeNeve</u>), 341 B.R. 53, 56 n.1 (Bankr. S.D. Fla. 2006); <u>accord</u>, <u>e.g.</u>, <u>Menchise</u> v. <u>Clark</u> (<u>In re Dealers Agency Servs</u>.), 380 B.R. 608, 612 (Bankr. M.D. Fla. 2007) ("Section 548 of the Bankruptcy Code and § 726.105 of the Florida Statutes are *substantially the same*"); <u>Goldberg</u> v. <u>Countrywide Home Loans, Inc.</u> (<u>In re Seaway Int'l Trans., Inc</u>.), 341 B.R. 333, 334 (Bankr. S.D. Fla. 2006) ("state fraudulent transfer provisions are otherwise *identical* to those found in the [federal] bankruptcy code"); <u>Bauman</u> v. <u>Bliese</u> (<u>In re McCarn's Allstate Fin., Inc</u>.), 326 B.R. 843, 849 (Bankr. M.D. Fla. 2005) ("Bankruptcy Code section 548 and Florida Statutes section 726.105 are *substantially the same*, and both address claims under the *same legal framework*"); <u>Woodard</u> v. <u>Stewart</u> (<u>In re Stewart</u>), 280 B.R. 268, 273 (Bankr. M.D. Fla. 2001) (holding that Section 548 and

Section 726.105 "are ***analogous in form and substance*** and may be analyzed contemporaneously"); Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank, FSB (In re Toy King Distribs.), 256 B.R. 1, 127 (Bankr. M.D. Fla. 2000) (holding that Section 548 and Florida fraudulent transfer law are "***substantially the same***"); Feltman v. Warmus (In re American Way Serv. Corp.), 229 B.R. 496, 529-30 (Bankr. S.D. Fla. 1999) (characterizing Florida's fraudulent transfer statute as "nearly ***identical***" to Bankruptcy Code Section 548); Levit v. Spatz (In re Spatz), 222 B.R. 157, 164 (N.D. Ill. 1998) ("the provisions of the UFTA parallel § 548 of the Bankruptcy Code").

Thus, courts routinely apply precisely the same substantive analysis to claims under Section 548 as they perform for claims under state fraudulent transfer law. See, e.g., LeNeve, 341 B.R. at 56 n.1 ("claims under both sections may therefore be analyzed simultaneously"); Seaway, 341 B.R. at 334 ("claims under both sections may be analyzed simultaneously"); McCarn's Allstate, 326 B.R. at 849 ("the analysis of what must be shown to prove actual fraud under both the bankruptcy and state law fraudulent transfer provisions is the same"). Appellant's invitation to extend Rubin's interpretation of the Bankruptcy Act to the current Code is thus a request for this Court to find a substantive difference between the UFTA and Section 548 never previously observed in this Circuit, in direct contravention to the myriad holdings that the statutes are substantively identical. While the UFTA speaks explicitly to a question on which the text of Section 548 remains silent, that mere silence is not a basis for holding them inconsistent or different. The Bankruptcy Court properly concluded that "the result under either the Florida Uniform Fraudulent Transfer Act or the New York Uniform Fraudulent Conveyance Act . . .

appear[s] to be the same as under Section 548, that a transfer is made at the execution of the loan document and the perfection of the liens and not at the date of a draw or an amendment to the loan documents where the liens themselves are not modified or changed."  R33 p. 145.  If a contrary result were mandated by "the case law interpreting" Section 548, as Appellant claims (Appellant's Br. p. 12), Appellant has failed to cite to any such case law other than <u>Rubin</u>.[6]

**B.      <u>Congress Never Endorsed Appellant's Position</u>**

Appellant's next argument that "Congress has endorsed <u>Rubin</u>'s holding" (Appellant's Br. p. 13) is completely unsupportable.  As Appellant is well aware, Congress has never made any statement whatsoever on the merits of <u>Rubin</u>.  Instead, Appellant imagines a Congressional endorsement of <u>Rubin</u> based solely on the assertion that Congress never amended the Bankruptcy Code explicitly to provide that <u>Rubin</u> is not an accurate statement of the current law.  To support this argument, Appellant relies on the proposition that "'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute

---

[6]      Indeed, while Shepard's discloses 289 cases citing to <u>Rubin</u>, almost none concern its holding that guarantors "'incurred' an 'obligation' of repayment . . . whenever [the borrowers] borrowed under the loan line."  661 F.2d at 990.  A separate, unrelated holding of <u>Rubin</u> on the role of indirect benefits in the reasonably equivalent value analysis accounts for the lion's share of the citing references.  Its holding on the time-of-conveyance issue has been conspicuously ignored.  Of the paltry four instances Appellee has been able to find of courts relying on <u>Rubin</u> for the latter holding, two were in dicta, and one was clearly wrong in that it found <u>Rubin</u> persuasive in interpreting one of the state statutes that explicitly rejected <u>Rubin</u>.  <u>LaRosa</u> v. <u>Pecora</u>, No. 07-0078, 2007 U.S. Dist. LEXIS 90415, *23 (N.D. W. Va. Nov. 27, 2007).

without change.'"  Appellant's Br. p. 13 (quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)).

This argument is defective for multiple reasons, the most obvious of which is that Congress did *not* "re-enact[] [the] statute without change."  The language of Section 548 simply is not the same as the language of its predecessor in the Bankruptcy Act, 11 U.S.C. § 67(d)(2) (1978) (repealed), which was at issue in Rubin.[7]  The Eleventh Circuit has observed that "the 1978 enactment of the revised Bankruptcy Code . . . worked major substantive and procedural changes in bankruptcy law" and that the "current" Code, "rather than" pre-Code case law, should be "the starting point" in any analysis.  Sublett v. Equitable Life Assurance Soc'y (In re Sublett), 895 F.2d 1381, 1385 (11th Cir. 1990).

Not surprisingly, in NLRB v. Bildisco & Bildisco, 465 U.S. 513, 524-25 (1984), the Supreme Court found "wholly unconvincing" the argument, based on "the canon of statutory construction that Congress is presumed to be aware of judicial interpretations of a statute," that "Congress should be presumed to have adopted the interpretation of the Second Circuit [in a pre-Code case] when it enacted" the current Bankruptcy Code.  The Court noted that there were pre-Code cases on both sides of the issue and that "Congress cannot be presumed to have adopted one standard over the other without some affirmative indication of which it preferred."  Id. at 525.  Indeed, if this canon of interpretation is applied here, it could just as easily be applied to presume that

---

[7]     Appellant argues that the two provisions should be considered "effectively identical" solely because they both use the words "obligation" and "incurred" (Appellant's Br. p. 11), but this appeal does not turn on the meaning of either such term; it turns on the question of *when* an obligation is incurred.

Congress was aware of the slew of precedents quoted in Part I.A above holding Section 548 "identical" or "substantially the same" as the Uniform Fraudulent Transfer Act, which explicitly provides that an obligation is incurred "when the writing [is] executed." UFTA § 6.5.

Lastly, Appellant's characterization of the Second Circuit as "the Circuit that governs the nation's financial hub" (Appellant's Br. p. 13) does not entitle <u>Rubin</u> to any greater deference, particularly in this case being litigated within the Eleventh Circuit.[8]  It is notable that in <u>Lorillard</u>, the Supreme Court's presumption that Congress was aware of judicial interpretations of a statute was not based on a single decision of a single court but on the accumulated decisions of "every court to consider the issue."  434 U.S. at 580. Simply put, no serious argument can be made that Congress, either explicitly or implicitly, ever intended the result urged by Appellant.

**C.     Even if *Rubin* Were Not Bad Law, It Is Entirely Distinguishable**

Appellant is not merely asking this Court to follow the discredited <u>Rubin</u> decision, but to extend it -- to an entirely different statutory regime, and to a materially different set of facts.  An important distinction between the Revolver here and the credit agreement in <u>Rubin</u> is that each draw on the <u>Rubin</u> credit line could only be made "[t]o the extent that the loans were approved" by the lender.  <u>Rubin</u>, 4 B.R. 447, 450 (S.D.N.Y.

---

[8]     Nor can Appellant's claim that <u>Rubin</u> "has been the law" in the Second Circuit for "28 years" be accepted given Appellant's failure to cite a single case in the Second Circuit (or elsewhere) following the portion of <u>Rubin</u> it relies on.  Appellant has just as scant a basis for claiming that <u>Rubin</u> remains the law in its own Circuit as it does for claiming that <u>Rubin</u> should be the law everywhere else.

1980).  Thus, the lender in <u>Rubin</u> had complete discretion to reject any draw request and no contractual duty to honor such requests.  In contrast, under the Revolver, the lenders were contractually obligated to honor draw requests.  R26 § 2.2(d).  Based on this unique feature of the credit agreement in <u>Rubin</u>, a scholarly criticism argued that "[l]ogic and policy compel the result that the <u>Rubin</u> case should be limited to its facts."  Steven L. Schwarcz, <u>The Impact of Fraudulent Conveyance Law on Future Advances Supported by Upstream Guaranties and Security Interests</u>, 9 CARDOZO L. REV. 729, 741 (1987).  Prof. Schwarcz reasoned that "[i]n the case of a discretionary loan facility" as in <u>Rubin</u> "where the lender has not promised to make advances, it is difficult to argue that any value has been given until the advances are actually made," but that "the result should be different" in cases like the present one involving loan agreements with a committed credit line.  <u>Id</u>. at 738.  In such cases, "value is given by the lender . . . at the time the loan agreement containing the commitment is executed, rather than the time that the future advance is made."  <u>Id</u>. at 739.

Appellant disputes this basis for distinction by conveniently characterizing the July 31, 2007 Revolver amendment itself as discretionary.  Since "the Revolver lenders voluntarily renewed the Revolver on July 31 in an amended form," Appellant argues, any subsequent draws should be deemed discretionary in the same sense as the draws in <u>Rubin</u>.  Appellant's Br. p. 12.  In fact, the lenders had neither the discretion to refuse any individual draw request nor the discretion to refuse further draws altogether.  The Revolver explicitly refers to the "payment[s] ***required***" to be made by the lenders when a draw request is made.  R26 § 2.2(d).  This "require[ment]" would have remained in force even if the parties did not "voluntarily" amend the Revolver in July, because the same

-17-

requirement existed in the January 2007 Revolver amendment, which would have continued to govern if the July amendment had never been made.  R9 § 2.2(d).

Moreover, nowhere in its complaint or in its amended complaint did Appellant even attempt to assert a claim for avoidance of draws after July 31 as a category of conveyance distinct from draws before July 31, 2007.[9]  To state a claim under Section 548, a plaintiff must plead "the dates and amounts of each alleged transfer," Perkins v. Crown Fin., LLC, (In re Int'l Mgmt. Assocs. LLC), No. 06-6421, 2007 Bankr. LEXIS 1566, *7 (Bankr. N.D. Ga. Mar. 6, 2007); Cohen v. Morgan Schiff & Co. (In re Friedman's Inc.), 385 B.R. 381, 467 (S.D. Ga. 2008) (same), but none of Appellant's complaints ever made a single allegation regarding the dates or amounts of any post–July 31 draws.  Instead, Appellant merely made a single allegation with respect to the total amount outstanding under the Revolver since its inception in March 2006.  R19 ¶ 32 n.7.  Any purported claim for the avoidance of any other amount is therefore not adequately pleaded.

**D.     The Bankruptcy Court Gave Appropriate
        Consideration to Public Policy Concerns**

Appellant accuses the Bankruptcy Court of substituting its own policy preferences for Congress's in taking into consideration the practical consequences of Appellant's argument.  See Appellant's Br. p. 12.  The Court observed "that the application of Rubin would make revolving financing extraordinarily difficult, because

---

[9]     To the extent the second amended complaint purported to do so, e.g. No. 08-1435 (Bankr. S.D. Fla.) D.E. #226 ¶ 48, those claims were voluntarily withdrawn by Appellant and thus cannot be reinstated by this Court on appeal.

every draw request under a revolving credit facility would require a solvency analysis at the date of the draw, which . . . would effectively put the lender in a position of having to choose between . . . honoring a draw request, or risking the prospect of being held liable for failure to fund under an existing credit facility."  R38 p. 95.  There was nothing improper about the Court taking note of such consequences, particularly given that its rulings were entirely consistent with the law and that the very same consequences were among the major factors that motivated the rejection of Rubin by nearly every legislature in the country (in statutes held substantively identical to Section 548).  See, e.g., Kenneth C. Kettering, The Pennsylvania Uniform Fraudulent Transfer Act, 65 PA. BAR ASS'N Q'TLY 68 (1994) ("Under the Rubin rule, a lender could rely on an upstream guaranty only by verifying that the subsidiary guarantor is solvent each time the lender makes an advance to the parent, which is a practical impossibility."); Frank R. Kennedy, Reception of the Uniform Fraudulent Transfer Act, 43 S.C. L. REV. 655, 669 (1992) ("To require a lender who has agreed to make discretionary advances to verify that a guarantor of the loan obligation was not only solvent when the original guaranty commitment was assumed but remained so when each and every advance was made[] may impose a serious transactional burden.").

        As these criticisms illustrate, what Appellant is effectively doing is asking this Court to hold revolving financing arrangements contrary to public policy.  The rule advocated by Appellant would require lenders, with every single draw on a revolving credit line, to obtain "the same representations and warranties as to the [borrower]'s financial condition . . . as was obtained at the time the loan facility was originally extended" and "perform[] the same level of due diligence regarding these financial tests

as was made originally."  Schwarcz, 9 CARDOZO L. REV. at 740.  The prohibitive expense

and burden associated with that process would deter any lender from extending credit on

a revolving basis and instead mandate that credit could only be extended in the form of

term loans, forcing borrowers like TOUSA with fluctuating cash needs to borrow money

they do not need -- and pay interest on those borrowings -- or risk defaulting on their

obligations to commercial creditors.  These consequences would not even be limited to

the wholesale credit markets but would also shut down the market for personal credit

cards, since insolvent cardholders could then max out their credit limits and avoid the

obligation to repay those charges.  Perhaps it is because Appellant realizes that the

practical consequences of its argument are so far-reaching and draconian that it insists the

Court has no authority to consider those consequences at all.

**E.    Appellant's Alternative Argument that Amending a Loan
        Agreement Resets Obligations Already Incurred Finds No
        Support in the Law or the Loan Agreements Themselves**

        As an alternative to arguing that the TOUSA Subsidiaries incurred obligations

within the meaning of Section 548 every time they drew on the pre-existing credit line,

Appellant argues that the TOUSA Subsidiaries incurred the obligation of repayment on

July 31, 2007 by virtue of the fact that the Revolver agreement was amended on that date.

The only authority Appellant cites in support of this argument is the principle that "where

the parties have clearly expressed or manifested their intention that a subsequent

agreement supersede or substitute for an old agreement, the subsequent agreement

extinguishes the old one."  Appellant's Br. p. 16 (quoting Lnzro Pizza Empire, Inc. v.

Brown, 645 N.Y.S.2d 379, 380 (N.Y. App. Div. 4th Dep't 1996)).  In so arguing,

Appellant wholly ignores the agreement's explicit language establishing that the

obligations already incurred were ***not*** superseded or extinguished.  As noted above, the July 31, 2007 amendment specifically provided that the obligations under the earlier iterations of the Revolver "shall not be affected" by the amendment and "shall continue." R27 pp. 1-2.  That is the polar opposite of "extinguish[ing]" pre-existing obligations and "substitut[ing]" new ones.

The precedent to address this issue most directly is <u>B.Z. Corp</u>. v. <u>Continental Bank, N.A.</u> (<u>In re B.Z. Corp.</u>), 34 B.R. 546 (Bankr. E.D. Pa. 1983).  In that case, the debtor took a secured loan before the statutory avoidance period but refinanced the loan within that period.  Rejecting the argument that the amendment somehow reset the conveyance dates of the original loan agreement, the Court explained:

> Section 548 allows the debtor to avoid certain transfers which occurred within one year prior to the filing of the petition.  In the case at bench the loan was made prior to the one year period and thus is not avoidable under § 548.  The renewal of the loan occurring within the one year period would not be avoidable under § 548(a)(2) since § 548(d)(1) provides that ***the renewal is deemed to have occurred at the time of the granting of the original loan*** because the loan was "so far perfected" at the time of the granting of the original loan that a bona fide purchaser could not have acquired rights in the collateral superior to the transferee. . . .

<u>Id</u>. at 548.  This analysis is consistent with the Bankruptcy Court's rationale for dismissal here, and Appellant does not cite a single case supporting a contrary result.

## II.

### <u>THE LIEN TRANSFERS ARE NOT AVOIDABLE AS THEY WERE MADE BEFORE THE ALLEGED INSOLVENCY DATE</u>

While Appellant believes <u>Rubin</u> gives it some cover with respect to its argument on the date obligations are incurred, its argument with respect to the dates the

lien transfers were made rests on no pertinent legal authority whatsoever and on an extreme mischaracterization of the facts.[10]

Among these misstatements is Appellant's claim that "the liens could not be, and were not, perfected before the [TOUSA] Subsidiaries signed the July 31 security agreements," because "Florida law generally requires that a security agreement be reduced to writing before the secured party may claim priority over another creditor." Appellant's Br. p. 17.  In fact, the record plainly demonstrates that the TOUSA Subsidiaries pledged their assets in writing to secure the Revolver in October 2006 (R8 p. 1), well before the July 31, 2007 *Amended* Security Agreement.  Indeed, that Amended Security Agreement specifically recognized the pre-existing "Original Security Agreement" of October 23, 2006, and provided that it was "the intent of the parties hereto that the security interests and Liens granted under and pursuant to the Original Security Agreement *shall continue* to be in full force and effect."  R13 pp. 1-2.

Next, Appellant declares, as if it were some sort of hitherto undiscovered smoking gun, that "we have become aware that financing statements concerning the July 31 Revolver were filed for every [TOUSA] Subsidiary *after* July 31, 2007."  Appellant's

_____

[10]   Appellant makes this argument not for valid jurisprudential reasons, but out of strategic necessity:  Even if Appellant were to prevail in the avoidance of all of the TOUSA Subsidiaries' obligations, the liens pledged by the TOUSA Subsidiaries would remain valid security to enforce the obligations of TOUSA, Inc. and TOUSA Homes LP, which are jointly and severally liable for the full Revolver debt and whose obligations Appellant does not seek to avoid (because they are not alleged to have received less than reasonably equivalent value).  Thus, unless Appellant can also avoid the TOUSA Subsidiaries' lien transfers securing the payment obligations of TOUSA, Inc. and TOUSA Homes L.P., a successful avoidance of the TOUSA Subsidiaries' repayment obligations would have no practical effect whatsoever.

Br. p. 18.  As Appellee is well aware, those financing statements were re-filed after July 31 so as to reflect the addition of the term loan lenders as secured parties, just as the mortgages were re-recorded for the same reason.  This was specifically addressed at the hearing before the Bankruptcy Court on the motion to dismiss the amended complaint.  R33 pp. 124-25.  Additionally, Appellant's second amended complaint contained these very allegations, not found in the initial complaint or amended complaint, concerning these alleged "new or amended UCC financing statements [filed] on August 1 and 2, 2007."  No. 08-1435 (Bankr. S.D. Fla.) D.E. #226 ¶ 41.  For Appellant now to suggest this is some game-changing revelation justifying this Court's "reinstat[ing] the complaint" (Appellant's Br. p. 18) smacks of desperation.  In any event, as those claims in the second amended complaint were voluntarily withdrawn by Appellant, no basis exists for this Court to "reinstate" them on appeal.

Turning to the substantive issue presented by Appellant's argument, Appellant acknowledges that "the Revolver lenders already had liens on the relevant property under previous versions of the Revolver."  Appellant's Br. p. 18.  That concession is fatal, but Appellant argues that it "is not trying to set aside those *earlier* liens; instead, the complaint seeks to set aside only the *July 31* liens."  Id.  This is nonsensical.  Even if the liens re-filed after July 31 could be avoided, the fact that Appellee retains valid liens on the same assets perfected well before July 31 would render such avoidance of no practical effect.  Moreover, the argument runs completely contrary to the plain statutory text of Section 548, which provides that "a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is

-23-

superior to the interest in such property of the transferee." 11 U.S.C. § 548(d)(1). Since Appellee, in its capacity as Revolver Agent,[11] already held perfected liens on the TOUSA Subsidiaries' assets before the July 31, 2007 liens were perfected, no purchaser from the debtor could have acquired an interest "superior to the interest" of Appellee at any time after the perfection of the original liens. Thus, the plain language of Section 548 mandates the result that all of the liens were transferred as of their pre-July 31 perfection date. The complaint and the amended complaint thus failed to state a claim for avoidance of either the obligations or the lien transfers.

---

[11] The Committee's claims against the term loans continue to be litigated before the Bankruptcy Court, and are not at issue on this appeal.

## CONCLUSION

For the reasons stated above, this Court should affirm the Order of the

Bankruptcy Court entering a final judgment of dismissal on Appellant's First Amended

Adversary Complaint.

**SMITH HULSEY & BUSEY**

By:   <u>/s/ Allan E. Wulbern</u>
Stephen D. Busey (117790)
Allan E. Wulbern (175511)
225 Water Street, Suite 1800
Jacksonville, Florida 32202
Telephone:  (904) 359-7700
Facsimile:   (904) 359-7708

**CHADBOURNE & PARKE LLP**

Thomas J. Hall (*pro hac vice* application
pending)
Thomas J. McCormack (*pro hac vice*
application pending)
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 408-5100
Facsimile:   (212) 541-5369

*Attorneys for Appellee Citicorp North America, Inc.*

Dated: June 15, 2009

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 2090-1(A)</u>

I certify that I am admitted to the Bar of the United States District Court for

the Southern District of Florida and I am in compliance with the additional qualifications

to practice in this Court set forth in Local Rule 2090-1(A).

<u>/s/ Allan E. Wulbern</u>
Attorney

**<u>Certificate of Service</u>**

I certify that a copy of this document was served electronically through the CM/ECF notification system to those parties entitled to notice, this 15th day of June, 2009.

*s/ Allan E. Wulbern*
Attorney
